**Opinion issued August 27, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00204-CV

———————————

## IN THE INTEREST OF E.G.A. AND G.S.A., CHILDREN

---

**On Appeal from the 310th District Court
Harris County, Texas
Trial Court Case No. 2022-32404**

---

\* \* \* \*

In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-24-00206-CV

———————————

**IN THE INTEREST OF A.M.A., N.X.A., N.A.A., AND A.J.A., CHILDREN**

**On Appeal from the 310th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-25607**

**MEMORANDUM OPINION**

In two related appeals, V.L.H. (Mother) challenges the decrees signed by the trial court following a bench trial terminating the parent-child relationship between her and six of her minor children.[1] Mother raises the same issues in each appeal. Among those issues, she contends that the evidence was legally and factually insufficient to support the trial court's statutory predicate findings that she "knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the children" and that she "engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children." *See* TEX. FAM. CODE § 161.001(b)(1)(D) (endangering

---

[1] The decree terminating Mother's parental rights in trial court cause number 2022-32404 to two of her children corresponds to appellate cause number 01-24-00204-CV. The decree terminating Mother's parental rights in trial court cause number 2016-25607 to four of her children corresponds to appellate cause number 01-24-00206-CV.

environment), (E) (endangering conduct). Mother also challenges the trial court's findings that termination was in the children's best interests. *See id.* § 161.001(b)(2).

Because we hold that the evidence was legally and factually sufficient to support the endangerment and best-interest findings, we affirm the trial court's decrees of termination.

## Background

Mother is the biological mother of seven children: (1) Ida (born June 2013), Aaron (born December 2014), (3) Norm (born January 2016), (4) twins Ned and Angela (born June 2017), and (5) twins Ethan and Gina (born September 2019).[2] The youngest six children have the same biological father, M.A.A (Marty). The oldest child, Ida, has a different father.

In 2016, Mother moved into an apartment with Ida, Aaron, and Norm, and Marty soon moved in with them. At trial, Mother testified that, while living at the apartment, Marty physically abused her, stating that Marty "always hit her" and gave her a black eye. He "banged [her] head against the wall multiple times to where [she] couldn't even get up and walk." She called the police when Marty was abusive, but, when they arrived, she would tell them that "everything was okay . . . because if [she] didn't, [Marty would] beat on [her] more." Mother recounted that Marty was

---

[2] We will refer to the children by aliases and to their family members by their relationships to the children or by aliases. *See* TEX. R. APP. P. 9.8.

3

taken to jail for one incident, stating that he "got charged for criminal mischief for kicking in my front door." She explained that "he was hitting [her] inside [the apartment]—the kids walked in and seen it—and [he] pulled a knife out on [her]" before kicking down her door. She was evicted from her apartment because of the incident. She moved to another apartment and allowed Marty to move back in.

Mother gave birth to twins Ned and Angela in June 2017. Around that time, the Department of Family and Protective Services (DFPS) received a report that Marty had sexually abused then-four-year-old Ida. During a forensic interview, Ida disclosed that Marty told her "[to] lick his weenie" and that he had touched her vagina with his hand. However, after making the outcry, Ida recanted, stating that "it didn't happen because she didn't want to talk about." DFPS concluded that there was "reason to believe" the sexual-abuse allegations. Mother completed family-based safety services, and Ida was provided therapy.

After the sexual abuse, Ida went to live with her maternal grandmother (Grandmother). Mother testified that she believed that Marty had sexually abused Ida, but she nonetheless allowed Marty to continue residing with her, Aaron, Norm, Ned, and Angela. Mother acknowledged that Ida saw Marty "a few times" after the sexual abuse "but not by herself."

Mother also testified that Marty used illegal drugs. After twins Ned and Angela were born in June 2017—but before twins Ethan and Gina were born in

4

September 2019—Marty introduced her to cocaine and Ecstasy, and Mother started using those drugs. Marty moved out "for the last time" two weeks after Ethan and Gina were born. She claimed that Marty was no longer around the children after that.

Mother testified that, in 2020 or 2021, she moved all of her children to Grandmother's house and placed the children in Grandmother's care. Mother continued to live in her own apartment and "would go back and forth" to Grandmother's house to help care for the children. Mother acknowledged that she would "go [to Grandmother's house] when [she] wanted to" and "leave when [she] wanted to." Mother testified that, after the children began living with Grandmother, she began using methamphetamine.

In November 2021, DFPS received a report that Marty was engaging in inappropriate communications with Ida. In the removal affidavit—a copy of which was admitted into evidence at trial—DFPS investigator Kyra Thomas testified that Ida "made an outcry on TikTok stating that [Marty sent] her pictures of girls kissing and dressed inappropriately." Thomas stated, "There are concerns that [Marty] ha[d] been stalking the home and may still have contact with the children."

DFPS caseworker, Alicia Balfour, sought to talk to the children, but Mother told her that she could not speak to the children without a court order. DFPS caseworker Makayla Gorden spoke to Ida's father, who said that he been trying to see Ida, but Mother had "denied [him] access to the child." Ida's father told the

caseworker that he was "concerned for [Ida's] safety as [Marty] was stalking the children and was sending inappropriate messages to [Ida]." He also told Gorden that "[Marty] indecently exposed himself to the children."

Gorden continued her efforts to interview the children without success. She contacted the Harris County Sheriff's Department to conduct a welfare check on the children, and Deputy Hudson was dispatched to the home. On January 28, 2022, Deputy Hudson called Gorden. He said that the visit was unsuccessful because Mother would not open the door for him.

On February 14, 2022, DFPS received a report that the children were "left unattended and [were] underweight for their age." According to the report, Mother "does not care about her children and [leaves] them to fend for themselves."

In April 2022, Mother moved from her apartment to Grandmother's house to live with her children. That same month, DFPS received a report from law enforcement that Mother had "let the children run around" outside between 3 a.m. and 4 a.m. "breaking windows." According to the report, the children were "covered in marks and bruises on theirs arms and legs."

On May 7, 2022, DFPS received a report that two-year-old Ethan was "running around the street and running through the yard with no supervision." Law enforcement was dispatched and found Ethan "to have no clothes or diaper on" when they arrived. Ten days later, DFPS received a report of "physical neglect." When

law enforcement arrived, they found the home in a "deplorable" condition "due to flies, maggots, and gnats." There was "garbage, rotten food, and clutter all over the home." The following week DFPS received a report that the home was "unlivable due to [urine] on the floor, holes in the wall, and fecal matter on the walls." The next day, DFPS received a report the children did not have clean clothes to wear and that the home was "unsanitary due to trash, flies, roaches, [and] clutter." The report stated that Mother was "an intravenous drug user and that she is rarely home to care for the children, so they are left with . . . their elderly grandmother."

On May 27, 2022, DFPS received another report of physical neglect for the children describing unsanitary conditions in the home, including that the floor was "covered with toys, trash, food, [and] feces both from the dog and human." That same day, DFPS investigator Thomas went to the residence. Mother was not home, but Grandmother permitted Thomas to enter to conduct a home assessment.

Grandmother escorted Thomas to the kitchen and turned on the light. In the removal affidavit, Thomas testified that she observed "roaches scattering on the floor and countertops, old food containers scattered on the floor and counters, [and] dirty dishes overflowing out of the sink." There were "flies and gnats on the dishes piled in the sink." She also saw dirty dishes in the bathroom sink. Thomas observed "eight or nine bags of garbage next to the kitchen" and garbage in other areas of the home. There were "more old food containers throughout the home" as well as piles of

clothes and other items. There "were red stains and holes in the walls throughout the home," and the home "smelled of urine, trash, and mold."

Law enforcement officers were also present during the assessment, including Deputy J. Guajardo with the Harris County Constable's Office. Deputy Guajardo told Investigator Thomas that he was familiar with Mother because he had responded to emergency calls at her apartment. Deputy Guajardo conveyed that, when Mother "consume[d] drugs," she "would "hallucinate" about men "trying to attack her," and she would call the police. When police responded, the calls would be determined to be unfounded. Deputy Guajardo stated the Mother had recently moved into Grandmother's home.

Deputy Guajardo also told Thomas that he had responded to calls at Grandmother's home. He said that, one month earlier, Grandmother called the police "because the children would not go to bed." Grandmother had allowed Deputy Guajardo to enter the home where he observed "dog and cat feces, old diapers, and old food." He said that the Grandmother needed help with the children, stating that "the children get out of the home at all hours of the night." He conveyed that "the children [had] pushed the a/c unit out of their bedroom window, went next door, and busted out the neighbor's bedroom windows."

During the home assessment, Thomas was able to speak with Mother. Thomas asked Mother for the names of relatives with whom the children could be placed, but

none of the relatives identified by Mother could take the children. Mother told Thomas that Marty was the father of her six youngest children but said that he was "not in the picture" because he had "molest[ed] and rap[ed]" Ida.

Thomas also spoke to Ida's father, who said that he "ha[d] been trying to get his daughter from [Mother], but she would not allow him to." He also stated that he was "willing to care for [Ida], but not the other children."

Thomas testified in the removal affidavit that she removed the children from the home after concluding that they were in immediate danger. Ida was picked up by her father, and the six younger children were placed in foster care.

On May 31, 2022, DFPS filed a petition in intervention in a suit that was initiated in 2016 by the Texas Attorney General's Office against Marty, which sought child support from him for Aaron, Norm, Ned, and Angela. In the intervention petition, DFPS sought temporary sole managing conservatorship of the four children. DFPS also sought to terminate Mother's parental rights if reunification could not be achieved. That same day, DFPS initiated a separate suit, seeking termination of Mother's parental right to the youngest twins—Ethan and Gina.[3] In both suits, the trial court appointed DFPS as the children's temporary sole managing

---

[3] DFPS also sought to terminate Marty's parental rights to the children, but he is not a party to either appeal.

conservator. Ida was picked up by her father, and DFPS did not include her in the termination suits.

On July 19, 2022, the trial court approved DFPS's family service plan for Mother. The service plan listed tasks and services that Mother needed to complete for reunification with her six children. Among these tasks and services, Mother was required to (1) maintain legal and verifiable employment and provide her caseworker with her most recent pay stubs, (2) maintain a safe, stable, and livable home for a period of six months, (3) attend all court hearings, visits, and permanency meetings, (4) participate in parenting classes, (5) submit to random drug testing, (6) complete a substance abuse assessment and follow all recommendations, including inpatient care, (7) complete a psychological assessment, (8) complete individual counseling, and (9) complete a victim domestic violence course.

After Mother failed to complete the family service plan, DFPS pursued the termination of Mother's parental rights to her six children. The 2016 and 2022 cases were tried together to the bench. Before trial, Marty signed affidavits relinquishing his parental rights to the six children.

Trial commenced in November 2023. After one day of testimony, trial was recessed. Trial resumed in January 2024 and concluded after three days of testimony.

Among DFPS's admitted trial exhibits were Thomas's removal affidavit, photographs of the interior of Grandmother's home taken by Thomas, Mother's

10

family service plan, and Mother's drug-test results. DFPS's first witness was Bruce Jeffries, a drug-testing expert. He testified that Mother's hair follicle test from June 2, 2022 was positive for methamphetamine and Xanax. Mother's urine test from that same day was also positive for methamphetamine and Xanax. Jeffries testified that the life span for methamphetamine in urine is one to three days. He agreed that, because the children were removed on May 31, it was possible that Mother used methamphetamine on the day of removal. Jeffries testified that the positive hair follicle test would indicate drug use "back to February 22, 2022," meaning that Mother used methamphetamine between June 2 and February 22, 2022.

Mother also submitted to an ethyl glucuronide (ETG) test on June 2, which tests for alcohol consumption within the last 80 hours. Jeffries explained that Mother tested positive for "a very high level of alcohol." He stated, "It's a level we don't see every day. That's for sure."

On August 5, 2022, Mother submitted to a urine test, which Jeffries confirmed was positive for methamphetamine and Xanax, and he confirmed that on August 21, 2022, Mother's hair follicle test was positive for methamphetamine and hydrocodone. Jeffries testified that Mother's hair follicle test for September 21, 2022, showed that her methamphetamine level had tripled since June 2.

Mother was again tested on October 28, 2022. The urinalysis showed that Mother's ETG level was 46,900, which Jeffries testified was "reaching a tier or

11

echelon of heavy alcohol intake." Jeffries stated that Mother's urine also tested positive for methamphetamine, Xanax, and nordazepam, which "can be Valium." Jeffries testified that, from the drug-testing documentation, he could tell that Mother did not have prescriptions for Xanax or nordazepam.

Jeffries also testified about Mother's March 21, 2023 hair follicle test. He stated that, while her methamphetamine levels had dropped, Mother tested positive for cocaine—a "new drug" for Mother. Finally, Jeffries testified that Mother's hair follicle test on November 8, 2023—one week before trial commenced—was positive for methamphetamine, cocaine, and tramadol.

DFPS next called Deputy Guajardo to testify. He testified that he first met Mother in 2021 when he began responding to her emergency calls. He said that Mother would call the dispatcher "frantic" claiming that someone was breaking into her apartment. But, when law enforcement responded to her home, there would be no sign of what Mother had reported. Deputy Guajardo stated that, in a nine-month period, law enforcement responded to almost 100 calls at Mother's apartment. He confirmed that the children were not there when he responded to the calls. He explained that he had taken Mother to the hospital ten to fifteen times under emergency detention orders for psychological evaluations because he had been concerned about Mother's "abnormal behavioral pattern." He further explained that that Mother would "put herself in harm's way by hitting people, by yelling at people,

numerous neighbors would call in and say, Hey, there's a lady out here screaming at the top of her lungs at us and [we have] no idea why." Deputy Guajardo testified that, once the psychological evaluation was completed, the hospital would release Mother, and they would be "back to square one" with her calling the police with false reports.

Deputy Guajardo testified that Mother had a drug and alcohol addiction and appeared intoxicated "[m]ost of the time." When asked whether Mother's family members tried to help her, Deputy Guajardo named Mother's brother, Doug, who was present "90 percent of the time" at Mother's residence.

Deputy Guajardo also responded to calls at Grandmother's home about ten times where he observed the children living in the home. Deputy Guajardo described the home as "a one-story wood frame structure with a brick facia, unkept lawn front and back, [and] inhumane living conditions in the interior of the home." There, Deputy Guajardo "saw dogs, cats, dog feces, cat feces on the floor, piles of clothing and boxes everywhere, just deplorable living conditions." He stated that it was difficult to enter the house because "things [were] blocking the door and just stuff everywhere in the house." He could enter only two or three feet inside the house and noted that "the smell was unbearable." He testified that, every time he saw the children, they were " unclean, unhygienic, not groomed, not kept" and "needed attention."

13

DFPS called Thomas to testify about the children's removal from the home. Her trial testimony was similar to her testimony in the removal affidavit. At trial, Thomas described the interior of Grandmother's home where the children were living. She testified that the conditions in the home were "deplorable." She saw bags of trash in the kitchen along with "old food containers, old food, [and] dirty dishes." When Grandmother turned on the lights, "there were roaches everywhere." Thomas referenced one of the photos admitted into evidence, pointing to what she called a "roach nest" near the kitchen sink. Thomas testified that there were dirty dishes and trash in the bathroom. The bathroom flooring had been removed, and there were holes in the walls. Thomas found four of the children sleeping in a bedroom. The bedroom was filed with piles of clothing and trash. Three of the children were asleep in the bed and a fourth child was asleep "on the floor, on the clothing and trash piles." Thomas testified that an unknown substance was "splattered" on the walls of the home, and her testimony indicated that there was trash, piles of clothing, old furniture, and other clutter throughout the home. She testified that the odor in the home "was a mix of like urine and like feces." While she testified, Thomas was shown photographs that she had taken of the home on the day of removal. The photographs corroborated her testimony describing the "deplorable conditions." Thomas testified that she removed the children from the home because they were in "immediate danger" due to the home's condition. The children were taken to the

hospital for a medical evaluation. Thomas testified that she observed "small bites" on the children's bodies, which the medical evaluation determined to be from bed bugs.

DFPS also called the conservatorship caseworker, Andrea Johnson, to testify. Johnson was assigned to the case in October 2022. She verified that she had reviewed the family service plan with Mother. Johnson confirmed that Mother had completed parenting classes, a psychological evaluation, individual counseling, a substance abuse assessment, and substance abuse classes. The substance abuse assessment recommended that Mother attend inpatient treatment. Johnson testified that Mother would not agree to attend inpatient therapy, but she had agreed to attend a "detox program." Mother finished the detox program in January 2023 but continued to test positive for illegal drugs after she completed the program. In March 2023, Mother's hair tested positive for methamphetamine and cocaine. Mother completed outpatient drug treatment in August 2023, but her hair tested positive for methamphetamine and cocaine in November 2023. Mother never completed the recommended inpatient treatment and never told Johnson why she did not complete it.

Johnson testified that Mother was ordered by the trial court to submit to drug testing at least seven times but only submitted to three court-ordered drug tests. Johnson testified that, under the terms of the family service plan, a missed drug test was considered a positive test. In addition to court-ordered drug tests, Mother was

required to submit to random drug tests requested by Johnson. Johnson testified that, for a period of at least eight months, Mother missed the requested random drug tests. In January 2023, Mother told Johnson that there was "no point" for her to take the drug test because it would be positive.

Johnson testified that Mother had also failed to maintain employment. Johnson explained to Mother that the family service plan required her to provide pay stubs to show that she was employed. Mother told Johnson that she had received job offers but did not take the jobs because she did not have adequate transportation. Johnson testified that she did not know how Mother was supporting herself.

When asked whether Mother had a suitable place to live, Johnson testified that Mother was "living with someone," but Johnson did not know "about the living conditions of the home." The family service plan required Mother to demonstrate appropriate housing "by providing a copy of a lease agreement and through home visits by the caseworker." Johnson testified that Mother had not asked her to visit the home and had not provided a lease to her. Mother had "only provided a letter from the person that she is living with to say that . . . she currently live[d] with them."

Johnson testified that Mother had two monthly scheduled visitations with the children. Mother was late to about 80 percent of the visits, but "she [was] appropriate" during the visits. Johnson said that Mother tried "to engage" with the

children both together and individually and that Mother would bring games, snacks, and educational materials to the visits.

The six children were placed in three separate foster homes. The oldest two children—Aaron and Norm—were together in a foster home. The older twins—Ned and Angela—were in a second foster home, and the youngest twins—Ethan and Gina—were in a third foster home.

Johnson testified that Aaron (age nine) and Norm (age seven) arrived in their current foster placement in March 2023. They lived with their foster mother, her biological son, and another male foster child. Johnson testified that the foster mother wants to adopt Aaron and Norm. Johnson described the foster home as providing structure for the children because the family follows a morning and afternoon routine. For instance, after school the children do homework and engage in activities as a family, such as playing games or watching movies.

Johnson stated that, when they were removed from Mother's home, Aaron—then age seven—and Norm—then age six—had not been attending school and could not read. Johnson stated that, "[a]t the beginning of the case," Aaron received Fs in every subject in school. Since being with his foster mother, Aaron has "made great improvement" and was receiving Bs in all subjects. Johnson said that Aaron still had some anger issues, but she had been working with him on those issues. She testified that Aaron and Norm both received therapy after their removal from Mother.

17

Johnson testified that Norm "struggled" after the removal "but not as much as [Aaron]." She said that Norm went from receiving Fs to being on the A and B honor roll during the current school year. The foster mother and the children attend church, and Norm "likes that a lot."

Johnson next addressed six-year-old twins Ned and Angela. She testified that they live in an adoptive placement with a foster mom, foster dad, and nine-year-old foster brother. Johnson confirmed that they have been in the placement since their removal from Mother.

When asked about Ned and Angela's daily routine, Johnson testified that in the morning the children get dressed, make their beds, have breakfast, and go to school. They are involved in afterschool sports activities, such as golf and tennis. The children then come home, do homework, eat dinner, take a bath, and go to bed. The children attend family gatherings with the foster parents' extended family and call the foster mother's father "papa." Johnson testified that Ned and Angela are in first grade. They required "tutorials to get on track" in kindergarten and were currently doing well in school. She said that the foster mother "was really good with doing activities with [Ned and Angela]" to help with their reading.

Regarding the youngest twins—four-year-old Ethan and Gina—Johnson testified that they have been in the same adoptive placement since their removal. They live with a foster mother and foster father are the only children in the home.

Ethan and Gina attend preschool five days a week, which they like, and are "very, very smart." She testified that the foster parents are teaching them colors, shapes, and letters, both in Spanish and in English. She remarked that the twins "are very advanced for their age." Johnson stated that the twins interact with the foster parents' extended family and "been on trips a few times" to visit family.

Because their foster homes are part of the same foster care agency, Johnson testified that of Ned, Angela, Ethan, and Gina have visited each other outside of their scheduled visitations with Mother. She said that Aaron and Norm's foster parents were open to discussing visitation with the younger four siblings.

When asked why DFPS sought to terminate Mother's parental rights, Johnson testified, "Due to how the children came into care and the current circumstances, if they are put back in that same situation, it would not be healthy mentally, physically for the children." She pointed out that Mother "does not have stable housing or employment to take care of the children." She noted that Mother was using drugs when the children were removed and that Mother's drug use continued throughout the case. Johnson stated that Mother had not been parenting her children, noting that Mother had "basically given" them to Grandmother. Johnson testified that, at the time of removal, the children's needs were not being met. When asked how, Johnson testified, "Hygiene for one, education for another. . . . They were missing meals, not eating as they should be." When asked how she knew that the children missed meals,

Johnson explained that the younger children were underweight. She also stated that, once in their foster placements, the children "hoard[ed] food," indicating that "previously they had to go without food."

DFPS also called Ned and Angela's foster mother (Foster Mom) to testify. Foster Mom confirmed that the twins had been living with her since removal. Foster Mom testified that, when they first came to her home, the two children were underweight for their age. Ned was 21 pounds, Angela was 23 pounds, and both wore size 18-month clothing despite being almost five years old. Foster Mom stated that Angela had severe tooth decay that "caused her a lot of pain eating and drinking." Since their placement with her, the twins had almost doubled in weight and had received dental care.

Foster Mom testified that, initially, Ned and Angela "would eat anything" and would "hide food consistently." She found food "under couches, under beds, [and] in the bathroom." The twins "would want to eat from a can directly" instead of from a plate. Other than chips and candy, Ned and Angela did not know the names of foods. For example, when Foster Mom asked them if they liked cheeseburgers or spaghetti, they "didn't know what any of that was."

Foster Mom testified that, when the children initially arrived, they had bed bug bites, scars, and scratches "everywhere" on their bodies. She explained that she had "to fill out an intake form showing the marks on their bod[ies] when we got

them, and there were so many that I didn't know how to notate them all on the sheet. There were just so many." She added that the children "had not had a bath or brushed their hair for . . . for some time."

Foster Mom testified that Ned and Angela did not understand routine when they arrived. She explained that they did not understand day or night, days of the week, or when to wake up or go to bed. She described how she established a consistent routine with the children but stated that it was "very difficult" because they "would get overstimulated and tired."

When asked how Ned and Angela are doing in school, Foster Mom stated, "Beautifully." She explained that "[t]hey were behind at first, even just going into kindergarten" because they "didn't know letters or numbers or words or. . . just schedule." Foster Mom stated that she initially placed them in a pre-K program and then provided them with a tutor while they were in kindergarten. She stated that she reads with them at least 20 minutes every night and that they excel in school.

Mother confirmed that she was committed to adopting Ned and Angela if Mother's parental rights were terminated. When asked if she would allow Ned and Angela to maintain contact with their siblings, Foster Mom testified that they already meet with their siblings and would "love to" maintain that relationship.

Foster Mom also testified that Ned and Angela made outcries of abuse to her. Angela told Foster Mom that Mother made her and Ned put cigarettes in their mouths

and smoke. Angela told Foster Mom that it made her sick and that it was "disgusting." Foster Mom said that Ned confirmed what Angela said.

Angela also told Foster Mom that, when they would "get in trouble," Grandmother would call Mother and Mother's brother Doug to come to the house. Angela and Ned referred to Doug as "the punisher" and disclosed that Doug would "Tase them with a Taser" as punishment. Foster Mom testified that Angela had scarring that "matched up with Taser marks." The children also disclosed that Doug would "hit them with hangers" and "would point a gun at them and pull the trigger."

In addition, the children told Foster Mom that Mother and Grandmother had forced them to drink alcohol, including beer and mixed drinks with liquor. Ned told Foster Mom that drinking the alcohol made him feel sick. He also told Foster Mom about an incident during which Grandmother became angry with Angela for eating her younger sibling's snack and slammed Angela's face into a closet door, causing her nose to bleed. Foster Mom said that Angela confirmed that the incident had occurred. Angela also told Foster Mom that Grandmother "had a gun and she would use the gun to shoot rats and that she would hold the gun to their heads and pull the trigger." Foster Mom testified that, since the outcries, Ned and Angela began therapy, which they attend twice a month.

Foster Mother testified that she had taken Ned and Angela to parent-child visits with Mother throughout the case. She testified that the children would ask her

every week whether they had to go to the visits. She added that they "start worrying about it early on" before the visit. Foster Mother stated that the children become "very nervous" and "sometimes they cry, sometimes they're mad and don't want to go." She said that on the way to the visits the children will get headaches. Sometimes the children would "start talking about memories of abuse" and would become "very nervous." When they arrive at the visits, Foster Mom said that Ned and Angela have "nervous excitement," meaning that they have "a lot of anxiety" that they "don't know what to do with it." They would tell Foster Mom that they wanted her to stay or that they did not want to see Mother.

Foster Mom testified that Ned's and Angela's reaction to each visit depended on whether it was "a good visit or a bad visit." Foster Mom stated that, if it was "a good visit," the children would "get in the car, maybe share a couple of things and then they crash[ed]." She said that, by the time they arrived home, the children would be "back to normal." But, if it was a "bad visit," then Ned would experience night terrors and wet the bed. She said that the children would have a "bad visit" about once per month. Foster Mom described a bad visit as one where Mother told the children that she was fighting to get them back. She said that would "send the children [into] a panic." Also, if Mother brought her brother Doug or Grandmother to a visit, or if the children saw them outside in the car, that would "trigger a bad visit." Foster Mom testified that she saw Doug at two visits and that sometimes

23

Mother drove Doug's car to the visits. The children would recognize the car and "be in fear that he [was] there." Foster Mom testified that Mother brought Grandmother to two or three visits. She said that, when the children saw Grandmother, they would "get right in between my legs, in between my arms and they will not leave my side." Mother explained that the effect of a bad visit would last "[a] good next 24 hours," and she would need to give the children's teachers "a heads-up that it didn't go well."

Foster Mom described a visit she attended on November 7, 2023, that concerned her. While she was in the waiting room, Ned and Angela came out of the visitation room panicked because Mother told them that she was "going to take [them] away" from Foster Mom. Mother told Ned and Angela that she would get a dog for them and take them to a hotel so that they can go live with her. The children told Foster Mom that they wanted to stay with her and not go with Mother. Foster Mom testified that, after that visit, Ned had night terrors for a week and a week or two of bed wetting. When asked whether she thought the visits with Mother were good for Ned and Angela, Foster Mother testified that the children dread the visits and had not wanted to attend them since the beginning. She said that the visits were disruptive to children's progress and to their lives and that the children were "pull[ed] backwards every time [they had] one of those visits."

DFPS also called Dorothy Florian-Lacy, a licensed therapist who had treated Aaron, Norm, Ned, and Angela. She had provided individual counseling for Aaron

24

and Norm twice each month from May 2023 to December 2023. She began working with Ned and Angela in February 2023 and continued to provide services to them.

Florian-Lacy testified that she observed two visits between Mother and the children to understand the sibling dynamics and their attachment to Mother. She observed that Aaron appeared to be bonded to Mother in "a superficial way," but agreed that Aaron was happy to see Mother. Florian-Lacy testified that Norm "was [a] little bit more glued to [Mother's] phone and playing games on the phone," but he also seemed happy to see Mother. Florian-Lacy testified that Ned and Angela showed more affection toward Mother than the other children.

Florian-Lacy's overall observation about the two visits was that Mother "wanted to convey that reunification [with the children] was a possibility." Florian-Lacy recalled that Mother asked the children if they wanted to come live with her. When the answer was not an immediate "yes," Mother "made it be known [to the children] that her feelings were hurt" and asked the children why they did not want to live with her when she had "things set up." When asked whether Mother's remarks were appropriate, Florian-Lacy testified that she believes that it is "not kind" to promise children "things that we can't deliver."

From her therapy sessions with the children, Florian-Lacy learned that the children "realized that [Mother] can want things but it doesn't necessarily come to fruition." She testified that Aaron "still wants to believe" Mother and "still holds out

25

hope" for reunification, but the younger children "have more of a reality-based experience." Florian-Lacy explained that Aaron's willingness to believe Mother's promises had caused some "friction" between Aaron and Norm.

Florian-Lacy also testified that, because he hoped to reunify with Mother, Aaron felt like he did not need "to really attach or follow the routines in [the] foster home." She said that Aaron's behavior when he arrived at the foster home was "was consistent with a pattern of dysfunction." Initially, Aaron gave "a lot of pushback" and did not want to bathe every day or clean his room. Florian-Lacy testified that she had worked with Aaron on those issues and explained that Aaron needed consistency to thrive. She said that the foster family provided that. When asked what evidence of trauma she saw, Florian-Lacy testified that Aaron had "clear emotional dysregulation." She described Aaron as "emotionally fragile," explaining that he would cry, scream, and become upset "when he doesn't get his own way." She stated that was "[n]ot typical of children his same age." In her opinion, returning Aaron to Mother would "retraumatize him."

Similarly, when she began working with Norm, it "appeared that structure and routine were . . . being introduced for the first time." She explained that the "foster family does a lot in the way of proactive structuring and reward systems." She stated that Aaron and Norm had "gravitated to that structure very nicely."

26

Florian-Lacy testified that, initially, Ned and Angela's issues involved improper verbalizations, such as calling each other "stupid or ugly," but they had learned to talk in a more considerate fashion. She stated that Ned and Angela had made progress in their interactions with each other, their siblings, and the foster family. She agreed that their foster home was a "healthy environment," explaining that Ned's and Angela's foster parents "went [to] great lengths to implement just routines and structure with a lot of positive reinforcement." She testified that, in her opinion, reunification with Mother would "retraumatize" Ned and Angela.

Wendy Schroeder, a CASA volunteer, testified that she worked primarily with the four youngest children—Ned, Angela, Ethan, and Gina. Schroeder explained that she saw the children once or twice a month, both at the family visitations with Mother and outside those visits. She stated that she had attended at least 24 family visitations between Mother and the children.

Schroeder recommended that Mother's parental rights to the four youngest children be terminated. She explained that all of the children had expressed to her that they did not want to see Mother, and she had observed the children being reluctant to attend the family visits. She said that, at times, she had to hold the children's hands and "lead them into the visitation room just to get them in there." Schroeder also "witnessed whenever [the children] go out to use the restroom" during the family visits, they did not want to return to the visitation room with

Mother. And she would "have to sometimes pull them away from the foster mother to get them to go back into the room."

Schroeder testified that she had visited Ethan's and Gina's foster home around 17 times. She said that the foster parents were "very interactive with the children" and that the foster mom was "very engaged." Before they started pre-K, the foster mother stayed at home all day with the Ethan and Gina. Now that they are in pre-K, the foster mother volunteers at their school. Schroeder said that, when the foster dad comes home, "the kids are very excited and they dance with him, they turn on music on the TV." Schroeder stated that the children are "well taken care of" and "well groomed." She described the foster home as "a very loving environment" and described Ethan and Gina as "happy."

Schroeder further testified that Ned and Angela's foster home was "a very, very good environment" and that the children were "very happy and they [were] progressing so well." She added, "The house is a family."

The other CASA volunteer, Jan Farrel, also testified. She worked primarily with the oldest two children—Aaron and Norm. Like Schroeder, Ferrell recommended that Mother's parental rights to the children be terminated. She stated that termination would "give the children an opportunity to progress, stay where they are, [and] be adopted." She testified that, during the pendency of the case, the oldest child, Aaron, had changed his mind about reunifying with Mother. She noted, that

during the family visitations with Mother, she observed Aaron sitting on the couch playing with a phone or playing with his siblings, but he rarely interacted with Mother. Ferrell stated that Aaron's current desire not to return to Mother was in his best interest.

Mother's attorney called her to testify. In addition to her testimony discussed above, Mother testified that she lived with a friend and her mother. She described the residence as a four bedroom, two bath house. She said that she paid $500 in rent for two of the bedrooms where she and the children could live. When asked how she made money, Mother responded that she babysat or "did odd jobs or whatever." She also worked "as needed" at a security job where she was paid in cash. And sometimes her family helped her pay rent. Mother admitted that she had not provided the required proof of employment to DFPS. She testified that she had applied for jobs, but her lack of transportation made it difficult to maintain one.

When asked why her older children had not attended school, she said it was because of Covid. She stated that she was unable to obtain the laptop computers needed for the children to engage in remote learning.

When asked to explain the unsanitary condition of Grandmother's home, Mother testified that, because she "wasn't there all the time," she could not explain how it happened." But, in an attempt to address the home's condition, Mother said that the children had a food fight on the day that they were removed. Mother also

said that she had moved her belongings to the home in boxes and that the children had gotten into the boxes.

Mother completed the individual counseling required by her family service plan, and she testified that from the counseling she had learned to hold herself accountable for her past conduct and mistakes. When asked for an example of a mistake that she made, Mother stated, "Doing drugs in the first place." Mother testified that she was no longer using drugs. She said that she had been attending AA meetings for about two months and went to the meetings once a week.

Mother testified that she wanted her children returned to her because she loved them and did not "want to miss out on any more than what [she] already ha[d] missed out on." She explained that her children would benefit from being returned to her because she is their mother, and nobody would care for them the way that she would.

On cross-examination, Mother admitted that, a couple of months before their removal, the children told her that Doug "put the Taser" on Ned's leg and had "whooped all the kids with [a] belt." Mother claimed that she had contacted the police about the incidents and told Grandmother not to allow Doug around the children. But she acknowledged that Grandmother continued to allow Doug in the home and that he continued to be around the children.

At the end of trial, the trial court granted DFPS's request in both cases to terminate the parent-child relationship between Mother and her children. The trial

court signed decrees terminating Mother's parental rights to her six youngest children, finding that termination was in the children's best interest and that Mother had engaged in the predicate acts listed in Family Code subsections 161.001(b)(1)(D), (E), (O), and (P). Specifically, the trial court found that clear and convincing evidence showed that (1) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger their physical or emotional well-being (subsection (D)); (2) Mother engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered their physical or emotional well-being (subsection (E)); (3) Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children (subsection (O)); and (4) Mother used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered substance abuse treatment program, or she continued to abuse a controlled substance after completing such a program (subsection (P)). The trial court also appointed DFPS as the children's sole managing conservator.

Mother appealed the decree in each case.

## Sufficiency of the Evidence

In each appeal, Mother presents the same three issues addressing the legal and factual sufficiency of the evidence supporting the termination of her parental rights.

## A.    Standard of Review

A trial court may order termination of the parent-child relationship if DFPS proves, by clear and convincing evidence, one of the statutory predicate grounds for termination and proves that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b); *see In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (recognizing that federal due process clause and Family Code both mandate "heightened" standard of review of clear and convincing evidence in parental-rights termination cases). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. The standard for reviewing legal and factual sufficiency of the evidence to support these findings reflect the elevated burden of proof. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

"In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding, but must otherwise assume the factfinder resolved disputed facts in favor of the finding." *Id.* at 630–31. "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631.

Reviewing the factual sufficiency of evidence "requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* In so doing, we "must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006); *see In re R.R.A.*, 687 S.W.3d 269, 279 n.50 (Tex. 2024) ("Reviewing courts . . . must defer to the factfinder's judgment as to the credibility of the witnesses and the weight to give their testimony, including reasonable and logical inferences from the evidence.").

## B.    Endangerment Findings

"To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding— even if the trial court based the termination on more than one ground." *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (citing TEX. FAM. CODE § 161.001(b)). Nevertheless, due process and due course of law requirements mandate that an appellate court detail its analysis for an appeal of termination of parental rights under

subsections 161.001(b)(1)(D) or (E)—the so-called endangerment grounds—when the trial court's order of termination contains findings on those grounds. *Id.* at 237; *In re J.W.*, 645 S.W.3d 726, 748 (Tex. 2022). Terminations under subsections (D) and (E) have special significance because they "may justify termination of parental rights to other children under subsection (M)." *In re R.R.A.*, 687 S.W.3d at 279; *see* TEX. FAM. CODE § 161.001(b)(1)(M).

In her second issue, Mother concedes that, "because she did not go to inpatient treatment as recommended by her substance abuse assessment," the evidence was sufficient to support the trial court's predicate findings under subsection (O). However, in her first issue, Mother presents challenges to the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings under subsections 161.001(b)(1)(D) and (E)—challenges we must address. *See In re R.R.A.*, 687 S.W.3d at 279; *In re N.G.*, 577 S.W.3d at 237.

### 1. *Legal Principles*

Subsection 161.001(b)(1)(D) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). Subsection (E) allows a trial court to terminate a parent's rights if the court finds by clear and convincing evidence that the parent "engaged in

34

conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Endangerment means to expose to loss or injury; to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (holding that "endanger" means to expose child to loss or injury or to jeopardize child's emotional or physical health). A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but DFPS does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d at 803.

While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. *In re J.I.G.*, No. 01-18-00023-CV, 2018 WL 3233874, at *8 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op.) (citing *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)). Subsection (D) "focuses on the child's environment and may be utilized as a ground for termination when the parent has 'knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child.'" *In re J.W.*, 645 S.W.3d at 749 (quoting TEX. FAM. CODE § 161.001(b)(1)(D)); *see In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (holding, in context of subsection (D)'s

focus on child's living environment, that parental conduct is relevant to child's environment). The child's "environment" encompasses the suitability of the child's living conditions and the conduct of parents or others in the home. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Inappropriate, abusive, or unlawful conduct by a parent or other persons who live in the children's home can create an environment that endangers the physical and emotional well-being of children as required for termination under subsection (D). *In re E.J.*, No. 14-23-00387-CV, 2023 WL 8043686, at *9 (Tex. App.—Houston [14th Dist.] Nov. 21, 2023, no pet.) (mem. op.) (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.)). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). A single act or omission may support termination under subsection (D). *In re E.J.*, 2023 WL 8043686, at *9 (citing *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)).

Subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d at 360; *In re J.I.G.*, 2018 WL 3233874, at *8; *In re J.T.G.*, 121 S.W.3d at 125. Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of

conduct by the parent. *In re S.R.*, 452 S.W.3d at 360. "While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from parents' misconduct alone." *Id.* (citing *Boyd*, 727 S.W.2d at 533).

A court may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re V.A.*, 598 S.W.3d 317, 331 (Tex. App.—Houston [14th Dist.] 2020, pet. denied). A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being. *See In re S.R.*, 452 S.W.3d at 367; *In re M.T.R.*, 579 S.W.3d 548, 568–69 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

### 2. *Analysis*[4]

Parental neglect "can be just as dangerous to the well-being of a child as direct physical abuse." *In re M.C.*, 917 S.W.2d at 270. Here, the evidence showed that Mother knowingly allowed her children to reside in unsanitary conditions at Grandmother's house. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at

---

[4] Because both subsection (D) and (E) concern endangerment and the evidence relevant to each subsection may overlap, as it does here, we discuss the sufficiency of the evidence supporting the predicate findings under those subsections together. *See In re D.D.D.*, No. 01-23-00078-CV, 2023 WL 4872399, at *6 (Tex. App.—Houston [1st Dist.] Aug. 1, 2023, no pet.) (mem. op.)

*15 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) ("Allowing children to live in unsanitary conditions can support a finding that a parent has endangered the children's physical and emotional well-being."); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions . . . may prove endangerment.").

Deputy Guajardo testified that Grandmother's home had "inhumane living conditions." Mother attempted to explain the conditions by stating that the children had a food fight the day they were removed and that the children had gotten into the boxes containing her belongings. However, Mother's explanation did not address the scope of what Deputy Guajardo described inside the home. He testified that he "saw dogs, cats, dog feces, cat feces on the floor, piles of clothing and boxes everywhere, just deplorable living conditions." It was difficult to enter the house because "things [were] blocking the door and just stuff everywhere in the house," and "the smell was unbearable."

Similarly, DFPS investigator Thomas testified about the "deplorable conditions" in the home. She stated that she saw bags of trash in the kitchen along with "old food containers, old food, [and] dirty dishes." When Grandmother turned on the lights, "there were roaches everywhere." Discussing a photograph she had taken of the kitchen, Thomas pointed to what she described as a "roach nest" near the sink. She testified that there were dirty dishes and trash in the bathroom. The

bathroom flooring had been removed, and there were holes in the walls. One child was found asleep "on the floor, on the clothing and trash piles." There was trash, piles of clothing, old furniture, and other clutter throughout the home and an unknown substance splattered on the walls. Thomas described the odor as a mixture of urine and feces. *See In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013, pet. denied) (holding that evidence of unsanitary conditions in child's residence— including dirty clothes, animal feces, and odor of smoke, mold, urine, and feces— was sufficient to show endangerment); *In re A.C.B.*, 198 S.W.3d 294, 299 (Tex. App.—Amarillo 2006, no pet.) (upholding finding of termination based on evidence of dirty diapers, trash, feces on the wall, and dirty clothing mingled on floor).

The evidence also indicated that the children's physical needs were not being met. The children's bodies were covered in bed bug bites, and they suffered from poor hygiene. Deputy Guajardo testified that the children always appeared "unclean, unhygienic, not groomed, [and] not kept." Foster Mom testified that Ned and Angela "had not had a bath or brushed their hair for . . . for some time." *See In re K.S.O.B.*, No. 01-18-00860-CV, 2019 WL 1246348, at *13 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) ("[T]he children's own uncleanliness constitutes indicia which may prove endangerment." (internal quotation marks omitted)); *In re D.M.*, 452 S.W.3d 462, 470 (Tex. App.—San Antonio 2014, no pet.) (concluding

that evidence of home's unsanitary conditions and child being dirty and covered in bug bites was sufficient to show endangerment).

Other evidence supported a reasonable inference that the children were not being properly fed. The younger children, including Ned and Angela, were underweight for their ages. Several witnesses testified that, once in foster care, the children hoarded food. Caseworker Johnson testified that the behavior indicated that the children had been previously deprived of food. *See In re L.W.*, No. 02-18-00107-CV, 2018 WL 3385694, at *5 (Tex. App.—Fort Worth July 12, 2018, pet. denied) (mem. op.) (concluding that parent's failure to provide food for children constituted voluntary conduct that endangered children). Foster Mom stated that Angela had severe tooth decay that "caused her a lot of pain eating and drinking." *See In re N.P.*, No. 09-20-00218-CV, 2021 WL 203339, at *6–7 (Tex. App.—Beaumont Jan. 21, 2021, pet. denied) (mem. op.) (upholding endangerment finding when record contained evidence of child's unaddressed dental issues).

Mother also knowingly allowed the children to reside where she knew they were exposed to physical, domestic, and sexual abuse. "Sexual abuse is conduct that endangers a child's physical or emotional well-being." *In re G.M.*, 649 S.W.3d 801, 809 (Tex. App.—El Paso 2022, no pet.); *see In re A.B.*, 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied) ("It is beyond question that sexual abuse is conduct that endangers a child's physical or emotional well-being."). Mother

40

testified that Marty sexually abused Ida in 2017 when he was living with her and her children. Despite her knowledge of the sexual abuse and completing family-based safety services as a result of the abuse, Mother continued to allow Marty to live with her and her children—except Ida who lived with Grandmother. Mother had two more children—Ethan and Gina—with Marty in 2019. Evidence of abuse committed against one child can support a finding of endangerment against other children who might later discover the abuse or be abused themselves, even if the other children were not yet born at the time of the abuse. *See In re T.L.E.*, 579 S.W.3d 616, 625 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *see also In re L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *12 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.) ("[P]redatory or harmful conduct directed at one child will support termination of parental rights as to a different child, because all children at risk for the same conduct by the same predator are endangered.").

"Texas courts have also determined that evidence of a child's exposure to domestic violence is supportive of an endangerment finding." *In re M.M.M.*, No. 01-17-00980-CV, 2018 WL 1954178, at *12 (Tex. App.—Houston [1st Dist.] Apr. 26, 2018, pet. denied) (mem. op.); *see, e.g.*, *In re K.S.O.B.*, 2019 WL 1246348, at *16 ([T]he fact that the children witness violence directed at another member of the household supports a finding of endangerment."); *In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.) ("[A] child can suffer emotional abuse when

witnessing domestic violence in the home."); *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (considering fact that mother "exposed her children to domestic violence," including incident during which mother was "smacked" in front of child, as evidence of endangerment). Domestic violence may constitute endangerment, even if the violence is not directed at the child. *In re M.M.M.*, 2018 WL 1954178, at *12; *see In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("Domestic violence may be considered evidence of endangerment. . . . If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.").

Mother testified that Marty "always hit her" and had given her a black eye. She stated that he "banged [her] head against the wall multiple times to where [she] couldn't even get up and walk." She called the police when Marty was abusive, but, when they arrived, she would tell them that "everything was okay . . . because if [she] didn't, [Marty would] beat on [her] more." Mother recounted that Marty was taken to jail for one incident. She stated that he "got charged for criminal mischief for kicking in my front door because he was hitting on me inside—the kids walked in and seen it—and [he] pulled a knife out on me." Marty then kicked down the door to her apartment. Mother and the children were evicted from the apartment because of the incident. Mother moved to a new apartment and allowed Marty to move in

again. *See In re S.Z.*, No. 04-18-00095-CV, 2018 WL 3129442, at *2, *6 (Tex. App.—San Antonio June 27, 2018, pet. denied) (mem. op.) (concluding that evidence was sufficient to support finding that parent placed or allowed child to remain in conditions or surroundings that endangered her physical and emotional well-being where parent admitted to history of domestic violence).

In addition, "[d]irect physical abuse is clearly conduct that endangers a child." *In re G.P.*, No. 01-16-00346-CV, 2016 WL 6216192, at *11 (Tex. App.—Houston [1st Dist.] Oct. 25, 2016, no pet.) (mem. op.); *see In re L.W.*, 2019 WL 1523124, at *14 ("[A]busive conduct by a parent or other person in the children's home may produce an environment that endangers the physical and emotional well-being of the children."). "Acts of violence or abuse directed toward one child can endanger other children who are not the direct victims of the conduct and support termination of parental rights to the other children." *In re M.F.M.*, No. 14-23-00974-CV, 2024 WL 3156150, at *7 (Tex. App.—Houston [14th Dist.] June 25, 2024, no pet.) (mem. op.)

Foster Mom testified that Ned and Angela made an outcry that Mother's brother, Doug, had physically abused them. Foster Mom testified that Angela told her that, when they would "get in trouble," Grandmother would call Doug to come to the house. Angela and Ned referred to Doug as "the punisher" and disclosed that Doug would "Tase them with a Taser" as punishment. Foster Mom testified that Angela had scarring that "matched up with Taser marks." The children also

43

disclosed that Doug would "hit them with hangers" and "would point a gun at them and pull the trigger."

Mother admitted that, a couple of months before their removal, the children told her that Doug had tased Ned on his leg and that Doug had "whooped all the kids with [a] belt." Mother claimed that she had contacted the police about the incidents and told Grandmother not to allow Doug around the children. But she acknowledged that Grandmother continued to allow Doug in the home. The evidence also showed that, after the children's removal, Doug was seen with Mother at the family visitations and that Mother drove Doug's car to the visitations.

Ned and Angela also made outcries of physical abuse against Grandmother. Ned told Foster Mom that Grandmother became angry with Angela and slammed Angela's face into a closet door, causing her nose to bleed. Foster Mom said that Angela had confirmed that the incident occurred. Angela also reported that Grandmother "had a gun and she would use the gun to shoot rats and that she would hold the gun to their heads and pull the trigger." Mother did not acknowledge that she knew about Grandmother's abuse, but Angela and Ned also disclosed to Foster Mom that Mother engaged in abusive conduct. They told Foster Mom that Mother forced them to put cigarettes in their mouths and smoke. Ned and Angela also disclosed that Mother and Grandmother forced them to drink alcohol, including beer

and mixed drinks with liquor. They told Foster Mom that the cigarettes and alcohol made them feel sick.

Finally, a parent's use of illegal drugs and the effect on her life and parenting ability may establish endangering conduct and an endangering environment under subsections (D) and (E). *See In re R.R.A.*, 687 S.W.3d at 281. The Supreme Court of Texas has confirmed that endangerment does not require a parent's drug use to directly harm the child. *Id.* at 278. "Instead, a pattern of parental behavior that presents a substantial risk of harm to the child permits a factfinder to reasonably find endangerment." *Id.*

Here, there was a close temporal relationship between Mother's pattern of drug use and the conditions necessitating the children's removal from her care. Mother admitted that she began using cocaine and Ecstasy after Ned's and Angela's births in 2017. In 2020 or 2021, the children began living with Grandmother, and Mother admitted that she began using methamphetamine. As discussed, the evidence showed that since 2017, the children have been subjected to neglect and abuse. Thus, Mother's drug use had a close temporal relationship with the children's neglect and abuse, and the trial court could have reasonably inferred that the children's neglect and abuse were related to Mother's drug use. *See id.* at 278–79.

"[E]vidence that the parent continued to use illegal drugs even though the parent knew her parental rights were in jeopardy is conduct showing a voluntary,

deliberate, and conscious course of conduct, which by its nature, endangers a child's well-being." *In re K.A.C.*, 594 S.W.3d 364, 373 (Tex. App.—El Paso 2019, no pet.). The evidence showed that Mother continued to use illegal drugs during the pendency of the termination proceedings. Mother tested positive for methamphetamine and Xanax three days after the children's removal. Over the course of the next 17 months, Mother tested positive for various drugs, including methamphetamine, cocaine, tramadol, Xanax, hydrocodone, and nordazepam. And two of the ETG tests showed that Mother had recently consumed high levels of alcohol. One week before trial commenced, Mother tested positive for methamphetamine, cocaine, and tramadol.

Mother also missed many of the random drug tests required under her family service plan. The service plan stated that missed drug tests would be deemed to show positive results. *See T. D. v. Tex. Dep't of Family & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.) ("The factfinder may infer from a parent's missing Department-requested illegal-drug tests during a parental-rights-termination suit that the tests missed would have come up positive.").

Although she completed outpatient drug treatment, Mother failed to attend inpatient drug treatment as required by the service plan. *See In re A.L.S.*, 660 S.W.3d 257, 273 (Tex. App.—San Antonio 2022, pet. denied) (upholding endangerment finding, in part, because appellant did not finish service-plan mandated counseling

46

and continued to use drugs in violation of service plan). The trial court could have reasonably inferred that Mother would continue to use illegal drugs and endanger the children's well-being in the future as she had in the past. *See In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

Viewing all the evidence in a light most favorable to the trial court's finding, and considering undisputed contrary evidence, we conclude that a reasonable factfinder could have formed a firm belief or conviction that (1) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children and (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d. at 631. Further, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm belief or conviction that (1) Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children and (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E); *In re A.C.*, 560 S.W.3d at 631. Thus, we hold that the evidence was legally and factually sufficient

to support the subsection (D) and (E) predicate endangerment findings, and we overrule Mother's second issue to the extent it challenges those findings.[5] *See In re A.C.*, 560 S.W.3d at 630–31.

## C.    Best-Interest Findings

In her third issue, Mother challenges the legal and factual sufficiency of the trial court's best-interest findings.

### 1.    *Legal Principles*

The Texas Legislature has listed factors that courts should consider in determining whether a child's parent is willing and able to provide the child with a safe environment, including: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude and frequency of harm to the child; (4) whether the child has been the victim of repeated harm after the initial intervention by DFPS; (5) whether the child is fearful of living in or returning to the child's home; (6) whether there is a history of abusive or assaultive conduct or substance abuse by the child's family or others who have access to the child's home; (7) the willingness of the child's family to seek out, accept, and complete counseling services; (8) the willingness and ability of the

---

[5]     Because Mother concedes that the evidence was sufficient to support the trial court's predicate subsection (O) finding, and we hold that the evidence supports termination of Mother's parental rights under subsections 161.001(b)(1)(D) and (E), we need not separately address Mother's additional sufficiency-of-the evidence challenge in issue two to the trial court's subsection (P) predicate finding. *See In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019).

child's family to effect positive environmental and personal changes within a reasonable period of time; and (9) whether the child's family demonstrates adequate parenting skills, including providing minimally adequate care for the child's health and nutritional needs, care consistent with the child's physical and psychological development, guidance and supervision consistent with the child's safety, a safe physical home environment, and an understanding of the child's needs and capabilities. TEX. FAM. CODE § 263.307(b).

In *Holley v. Adams*, the Supreme Court of Texas also identified several non-exclusive factors that we should consider when determining whether the termination of a parent's rights is in the child's best interest, including (1) the child's desires; (2) the child's current and future physical and emotional needs; (3) the current and future physical danger to the child; (4) the parental abilities of the person seeking custody; (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child; (6) the plans for the child by the person seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the parent-child relationship is not proper; and (9) any excuse for acts or omissions of the parent. 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and it is not necessary that DFPS prove all these factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The absence of evidence concerning some of the

factors does not preclude a factfinder from forming a firm belief or conviction that termination is in the children's best interest. *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

The best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*; *see In re C.H.*, 89 S.W.3d at 28 (stating that past performance as parent "could certainly have a bearing on [parent's] fitness to provide for [the child]" and indicating courts should consider prior history of child neglect in best-interest analysis).

### 2. *Analysis*

Here, multiple factors support the trial court's findings that termination of Mother's parental rights to the children was in their best interests.

Regarding the first *Holley* factor—the children's desires—Mother points out that CASA volunteer Ferrell testified that Mother loves the children, and the children love her. She also points out that the evidence showed that the oldest child, Aaron, had expressed a desire to reunify with her early in the case. However, Ferrell testified that Aaron's current desire was not to return to Mother. CASA volunteer Schroeder testified that the four youngest children expressed to her that they did not want to

see Mother, and she had observed the children being reluctant to attend the family visits. At times, she had to hold the children's hands and "lead them into the visitation room just to get them in there." Schroeder stated that, "whenever [the children went] to use the restroom," they did not want to return to the visitation room, and she would "have to sometimes pull them away from the foster mother to get them to go back into the room."

Mother points out that therapist Florian-Lacy testified that she had observed Ned and Angela climbing up on Mother's lap during visits and showing more affection to Mother than the other children. However, Foster Mom testified that Ned and Angela did not want to attend visits with Mother. She also testified that, if Mother told Ned and Angela during a visit that she was "fighting to get them back," Ned would experience night terrors and wet the bed. Foster Mom testified that, during one visit, Ned and Angela came out of the visitation room panicked because Mother had told them that she was "going to take [them] away" from Foster Mom. They relayed that Mother said that she would get them a dog and take them to a hotel so that they could live with her. The children told Foster Mom that they wanted to stay with her and not go with Mother. Foster Mom testified that, after that visit, Ned had night terrors for a week and wet the bed for a week or two. *See* TEX. FAM. CODE § 263.307(b)(5) (providing that court may consider "whether the child is fearful of living in or returning to the child's home" in best-interest analysis).

51

The evidence supporting the predicate endangerment findings also supported the trial court's findings that termination of Mother's parental rights was in the children's best interest. *See In re C.H.*, 89 S.W.3d at 28 (holding that same evidence may be probative of both section 161.001(b)(1) and best-interest grounds). As discussed, the evidence showed that, for several years preceding the children's removal, Mother used drugs, namely, methamphetamine, cocaine, and Ecstasy. "Parental drug abuse reflects poor judgment and may be a factor to consider in determining a child's best interest." *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.— Houston [1st Dist.] 2017, pet. denied); *see* TEX. FAM. CODE § 263.307(b)(8) (stating that courts may consider history of substance abuse by child's family in best-interest analysis). As the evidence here demonstrated, "drug use can destabilize the home and expose children to physical and emotional harm if not resolved." *In re A.L.S.*, 660 S.W.3d at 275–76.

After she began using drugs, Mother sent the children to live with Grandmother, while Mother lived separately in an apartment. The evidence showed that Mother knowingly allowed the children to live in the unsanitary conditions at Grandmother's home where their physical needs, such as proper hygiene and adequate nutrition, were not being met. *See In re R.J.*, 579 S.W.3d 97, 119 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) ("[E]vidence of unsanitary conditions of a home may support the trial court's best-interest finding."). The evidence also

showed that, prior to their removal and while she was using drugs, Mother knowingly allowed the children to be exposed to sexual, domestic, and physical abuse. *See In re K.K.*, No. 09-20-00300-CV, 2021 WL 2148857, at \*4 (Tex. App.—Beaumont May 27, 2021, pet. denied) (mem. op.) (finding that parent's exposure of child to domestic violence supported finding that termination was in child's best interest); *In re A.B.*, 125 S.W.3d at 778 (stating that parent's "failure to protect the emotional well-being of the children following the allegations of sexual abuse" supported trial court's best-interest finding); *see also* TEX. FAM. CODE § 263.307(b)(7) (identifying history of abusive or assaultive conduct by child's family as relevant to best-interest analysis). Mother's drug abuse and her concomitant failure to care for and protect her children are relevant to multiple *Holley* factors, including her parenting abilities, the stability of the home, the children's emotional and physical needs now and in the future, the physical danger in which the children could be placed now and later, and her acts or omissions pertinent to determining whether the parent-child relationship is improper. *See Holley*, 544 S.W.2d at 372; *In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (recognizing pattern of drug abuse relevant to multiple *Holley* factors).

The evidence also showed that, despite participating in outpatient substance-abuse counseling and individual therapy, Mother did not refrain from illegal drug

use during the pendency of the termination proceedings. She tested positive for drugs throughout the proceedings and missed numerous required drug tests, rendering them presumptively positive. And, although she knew that her parental rights were in jeopardy, Mother failed to attend inpatient treatment required by her service plan. *See* TEX. FAM. CODE § 263.307(b)(10), (11) (stating courts may consider willingness and ability of child's family to seek out, accept, and complete counseling services and willingness and ability of child's family to effect positive environmental and personal changes within reasonable period of time); *Holley*, 544 S.W.2d at 372 (listing, as best-interest factor, programs available to assist individuals to promote best interest of child); *see also J.M.T.*, 519 S.W.3d at 270 (recognizing that parent's failure to refrain from illegal drug use and complete substance-abuse counseling supported best-interest finding). Given Mother's history of illegal drug use, her positive drug tests, and her non-attendance of inpatient treatment, the trial court could have reasonably inferred that Mother's drug use would continue in the future, placing the children at a continued risk for neglect and abuse. *See id.* The trial court also could have reasonably inferred that the children remained at risk of physical abuse by Grandmother and Doug because the evidence showed that Mother continued to associate with them after removal. For instance, the evidence reflected that Grandmother and Doug attended some family visits with Mother.

54

The evidence also showed that caseworker Johnson could not verify whether Mother had safe and stable housing because Mother did not comply with the terms of her family service plan. The plan required Mother to demonstrate appropriate housing "by providing a copy of a lease agreement and through home visits by the caseworker." Johnson testified that Mother did not ask her to visit the home and had not provided a lease to her. Mother had "only provided a letter from the person that she is living with to say that . . . she currently live[d] with them."

Mother also did not provide proof that she had obtained suitable employment. Johnson testified that Mother had not provided her with pay stubs as required by the service plan. Johnson stated that she did not know how Mother was supporting herself. Mother testified that she earned some money by babysitting and working security "as needed." She stated that she was paid in cash.

In short, the evidence was such that the trial court could have reasonably inferred that Mother did not have stable housing or income during the pendency of the proceedings. This evidence was probative of the children's best interest because "[a] parent who lacks stability, income, and a home is unable to provide for a child's emotional and physical needs." *In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see Holley*, 544 S.W.2d at 372 (best-interest factors include stability of home and child's physical and emotional needs); *see also In re M.R.*, 243 S.W.3d 807, 821

(Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child.").

In comparison, the evidence reflected that the three foster families, who cared for the children and wanted to adopt them, have safe, stable homes, and could provide the children with permanency. Mother acknowledges in her brief that the "respective foster caregivers are taking wonderful care of all of the children" and "are in the best position to care for the present and future physical and emotional needs of the children."

The evidence showed that the foster families provided structure, consistency, and positive reinforcement for the children, all of which they lacked while in Mother's care. The families provide healthy environments and encourage healthy habits in the children, such as personal hygiene. The evidence also showed that the foster parents have sought services to help the children. For instance, the four oldest children are in therapy. The foster families have integrated the children into their respective families while demonstrating a willingness to allow the six siblings to maintain a relationship.

The evidence demonstrated that, when they came into foster care, the children were behind academically. Aaron—then age seven—and Norm—then age six—had not been attending school and could not read. Mother claimed that the children were

not in school due to challenges related to the Covid pandemic. *See Holley*, 544 S.W.2d at 372 (listing any excuse for acts or omissions of parent as best-interest factor).

While living with the foster families, the children have been attending school, including the youngest children—Ethan and Gina—who attend preschool. The foster parents provide a structured and consistent environment, which includes doing homework, and the foster parents are actively engaged with the children's education. By the time of trial, all six children were succeeding academically.

In short, the evidence showed that the children are thriving in their foster homes. *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (stating that stability and permanence are important to upbringing of child and affirming finding that termination was in child's best interest when child was thriving in foster care). The evidence regarding the foster homes supports the trial court's best-interest findings under the following factors: the emotional and physical needs of the child now and in the future, parental abilities, and the stability of the home. *See Holley*, 544 S.W.2d at 372.

We acknowledge that some evidence exists in the record weighing against the trial court's best-interest findings. For instance, Mother points out that the evidence showed that she finished her individual counseling and that she attended all of the scheduled visits with her children where she appropriately interacted with them.

Mother also completed some of the other requirements of her service plan. And she testified that she had been attending AA for two months and abstaining from drugs.

"Although there is some evidence weighing against the best-interest finding, evidence cannot be read in isolation; it must be read in the context of the entire record." *In re J.M.T.*, 519 S.W.3d at 271. As discussed, the evidence showed that the children were removed from Mother's care because they were living in unsanitary conditions that posed a threat to their physical and emotional well-being. Mother was also using illegal drugs and had allowed the children to be exposed to sexual, domestic, and physical abuse. The evidence established that Mother continued to use drugs throughout the termination proceedings and refused to attend required inpatient treatment. She also continued to associate with family members that the children had disclosed physically abused them. The evidence reflected that Mother had not maintained suitable housing or employment during the proceedings.

On balance, an analysis of the evidence reveals that the applicable *Holley* and statutory factors weigh in favor of the best-interest findings. The evidence reasonably supported implied findings by the trial court that Mother was not willing or able to address the concerns that had caused the children's removal in the first place, including her drug use, and that Mother was unable to provide a stable and suitable home or the permanency that young children require.

Viewing all the evidence in a light most favorable to the trial court's best-interest findings, and considering any undisputed evidence to the contrary, we conclude that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. *See* § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 631. Further, considering the entire record, including evidence both supporting and contradicting the trial court's finding, we conclude that a factfinder reasonably could have formed a firm belief or conviction that termination of Mother's parental rights is in the children's best interests. *See* § 161.001(b)(2); *In re A.C.*, 560 S.W.3d at 631. Therefore, we hold that the evidence is legally and factually sufficient to support the trial court's best-interest findings. *See In re A.C.*, 560 S.W.3d at 630–31.

We overrule Mother's third issue.

## Conclusion

We affirm the trial court's decrees of termination.


Richard Hightower
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.